The first case call for oral argument is Berry v. Tobin. Counsel, whenever you're ready, you may proceed. Thank you, Your Honor. Please report, Counsel. I'm Rob Olin from Decatur. I represent the appellant, Jesse Berry. Mr. Berry has filed an attorney malpractice case against the defendants, and this stems from the defendants' failure to file at all an FELA case against the plaintiff's former employer, or didn't know her folk had said it, really. This case comes here because the trial court granted the defendants' motion for summary judgment, and the grant of summary judgment was based, while the order doesn't say, the grant must have been based upon a conclusion that the FELA statute of limitations had expired on plaintiff's claims before he retained the defendants' attorneys. He retained the defendants' attorneys on January 27th of 2005, and that means that the statute of limitations must have expired before that date. It must have accrued before January 27th, 2002. The defendants have said and convinced the court that the plaintiff had a longstanding left knee injury, that he knew that it was associated with work, and for that reason the accrual started much before January 27th of 2002. In the very latest, on November 20th of 2000, that's the date on which the plaintiff had been seen by an orthopedic surgeon who had diagnosed that indeed he had very advanced left knee arthritis, and that at some point in the future he was actually going to have to have that left knee replaced. Well, what did he know after that date that he didn't know on the date that the doctor told him, you've got this problem, and it comes from your work at the railroad, and it's only going to get worse? Okay. First off, the doctor didn't tell him that, but the doctor said that he had this condition, that it was multifactorial, and that his work on the railroad might be contributing to it. I understand that under freeze that might be contributing to it is enough. If there was an actionable claim at that time, it is our position, Your Honors, that he had no FBLA claim relating to his left knee. You don't think at that point in time he didn't have a repetitive trauma type FBLA claim? No, I don't. On what basis do you conclude that? I conclude that, Your Honor, on his work history. At that time, he was the supervisor of welding, and he had been in welding for the railroad for nearly 20 years, general labor for only six months of that time period. Because of the welding job that he did, he had very little of the kind of trauma that might aggravate this injury. Notably, his testimony was that his job as a welder had him walking on ballast, which is, of course, uneven and difficult for bad knees, walking on ballast maybe 200 feet a day. That, Your Honor, is what all railroaders walk on ballast if they walk on ballast at all. When the court says that learning about his situation at that point in time necessarily raised an FBLA case, the court is saying, as a matter of law, that every railroader in these United States has an FBLA claim right now because he's walking on ballast 200 steps a day. That's not true. That's not the case. Not every railroader suffers a knee injury from walking on ballast, though. That's true, Your Honor. And the point, I think, is that any railroader who has any condition in his knees is going to then say, you're going to then say, if you ever want to sue for this knee, even if this knee is hurt by a different reason, and I do want to get to that, even though it's hurt by a different reason, your statute of limitations started back then. The question in FBLA, as you all know, is this isn't workers' compensation. We have to prove that there was negligence. And we do not believe, and plaintiff did not believe, that the railroad was negligent for having him walking on ballast that much at that time. Now, there was a dramatic change that happened, and that's when we believe the FBLA claim arose. The dramatic change was on January 1 of 2002, his job was changed. He wasn't asked about it. He was told, you are now going to be supervisor of yard cleaning. And what that person does is to supervise the crew that run a very large machine, roughly one-and-a-half locomotive size. It runs down the tracks, and where the tracks are dirty because it spills the various objects, this machine will clean it up. Now, initially, that's not a problem because you're riding along the machine, and so you don't have to walk much. But one of the people that he was supervising made a mistake that led to a problem, and his boss told him, and now we're talking about moving from January of 2002 to sometime in the middle of 2002. That's his testimony. We don't have it better down for that. At that point in time, his supervisor said, okay, no more riding along and no more trusting these people to open and shut the... That was the open switch. Yeah. And so he then was assigned by his supervisor to walk along the side of the machine as it went there. His walking on ballast then changed from a couple hundred feet a day to up to 10,000 feet a day. This happened sometime in the middle of the year. By September 6th, his knee was in such terrible shape that he went to his family doctor and was immediately sent on to his orthopedic surgeon who looked at him. And then we have the, in this case, rather famous September 13, 2002 examination and opinion by the orthopedic surgeon. And the orthopedic surgeon said at that time that it was clear that his changed job conditions had caused this injury. Now, the changed job conditions caused it so that he actually was no longer able to do this job. He went from a person who was... It was aggravation of the preexisting condition. It was causation of disability. It was after this extreme aggravation, and I say extreme because, Your Honor, the medical records say that the pain moved into, it was literally called excruciating by the physician's assistant who did the palpation. Importantly, when the orthopod saw him a week later, he said he had been doing well in the last couple of years since I last saw him just using pain medication to do it. He can no longer do it. So he moved from a situation of having pain but being able to do his job. And remember, his testimony was that he never missed any work during that time period to being disabled. And after he saw the physician, the physician required that he couldn't stand for more than two hours, that he couldn't climb up and down onto the machine. They had to give him a different job, but his knee was wrecked so badly that he couldn't do that. And then the day before his 52nd birthday, he was required to terminate, and he went on complete disability. He'd been making about $60,000 a year, so he'd lost 10 to 15 years of income at that, plus the pain and suffering. What we are saying, Your Honors, is that the FRIES rule doesn't apply here. The FRIES rule is a great rule for a one condition that causes over a period of time repetitive injury, and really the question is, we're going to put off using a discovery rule until this person knew or should have known that they were injured because of work. They had an injury, it was because of work. Here, that's not the case, because his initial left knee problem was not just a work injury, but was actually everything in his life. If you look at the physician's entry on that, he mentions that he had 30 years on the railroad, but he doesn't say that caused this. He said it was caused by playing football, being injured numerous times in football, having a stress test where his knee popped out on him, getting out of a four-wheeler when his knee went bad. He mentioned several things, and, of course, he was very bald-legged and he was overweight and all these things added to the situation. He mentions that he worked for the railroad, but in his note he never said that the railroad caused this injury or even aggravated it. I thought when he went to see Dr. Scott in November of 2000, he believed his years of working for the railroad was the cause of his knee pain. That was testimony. Yeah, no, I agree with that, Your Honor. Dr. Scott's note did not make that conclusion, but Jess Berry believed that that was the situation, and he believed that the doctor believed that too. We're not denying that he had actual knowledge on that time, that his left knee was multifactorial and that work contributed to that. We are denying that he had an FELA claim at that point. The court below has basically said, as a matter of law, he had an FELA claim in November of 2000, therefore his FELA claim approved and that what happened later was irrelevant to that. We disagree totally with that. We believe that there was no FELA claim at that point in time, that it was just a normal situation. He was another railroader undergoing non-negligent work conditions. He hired Pratt & Tobin November 27, 2005. January 27, 2005. Yes, he did. What did he hire him for? He hired him for the left knee. He hired him for the left knee because, let's recall, that as of February 1, 2003, he was on complete disability from the railroad because of his left knee. He also had a back problem and another problem, but he was actually on disability because of his left knee, and that's what he hired him for because he was on complete disability. That occurred in 2003. It was diagnosed clearly on September 13, 2002. He came to the conclusion himself that he was being hurt by this new job and the new responsibilities in the middle of 2002. The reason that it becomes an FELA claim at that point was, when his supervisor gave him this new and very additional job to do in his new job, in other words, walking along, opening the gates and things like that, when he gave him that, he said, doing that much walking on the ballast is going to be really bad for my knee. I've got a bad left knee. That's going to hurt my knee. He put the railroad on notice of that and asked his boss, said, well, you're going to do that anyway, and we're not going to let you ride along and favor your knee. So the railroad clearly made the decision at that point to expose him to additional injury and, unfortunately, Jess was right, and it destroyed his knee. In the next three or four months, it got so excruciating that the doctor said, okay, you can't do this anymore, and he ends up disabled. So we believe that the occurrence that happened in the middle of 2002 through September of 2002, that was the event which created the FELA claim. Obviously, three years after that is the middle of 2005 to September of 2005. By that time, he had had the defendants for his FELA claim, for this FELA claim specifically, for a period of several months. They didn't file anything, and when he was dissatisfied with the way that they weren't returning calls except to say once in a while everything's fine, he finally fired them in July of 2006, so they had the case a year and a half, and hired another clerk who immediately put the case on file. The railroad, of course, filed a motion for summary judgment, and the court in Macon County agreed that as to his left knee only, and he said that there was a question of fact with regard to the other claims, as to his left knee only, it was very clear that that statute started to run at least as of September of 2002, and therefore this was filed in August of 2006. That was too late. Those are the damages, Your Honor. We believe, then, that genuine issues of material fact exist as to when the actual FELA claim came into existence. We do not believe that it is a presumption that his knowledge that he had non-actionable knee problems in 2000 that as a matter of law that that starts his statute of limitations running. We disagree totally with that. As a matter of fact, we find it hard to understand why we're even defending the situation, because this particular defense saying that the statute of limitations expired before we hired him, that's certainly an affirmative matter which should have been raised in the pleadings, and never was, and defendants never asked to amend the pleadings to raise that. Then we get to how did this come up? How did this motion for summary judgment come up? You've read the briefs. You understand that the discovery for plaintiff against defendants was impossible. We never got their depositions, any of them. They got our depositions. They got doctor depositions. We always answered discovery within the time. Defendants never answered discovery within the time, and only after we had to bring motions and get them set for hearing. We filed several motions for discovery sanctions, and those motions were never heard. Finally, on June 6th of 2011, the court takes away the stay from doing discovery against defendants and sets outstanding motions for hearing on July 1st of 2011. The only outstanding motions at that time were plaintiff's motions for sanctions. So the defendant then, two weeks later, files a motion for summary judgment, which is the only thing that's called up for hearing on July 1st. We barely were able to get an answer in on time. The judge hadn't had a chance to read it and hadn't read it. So we believe, Your Honor, that it, and I'm not saying that's against the local rules, because while several circuits have local rules concerning motions for summary judgment, setting up very standardized briefing schedules, that particular circuit does not. So what happened was certainly legal. The problem was this motion was never set for hearing on the day it was heard. Is there anything in the record that supports that you asked the court to rule on your motions prior to ruling on the defendant's motion for summary judgment? I should know the answer to that, and I don't. I believe that I pointed out at the beginning of that hearing that this should be the motions which are set for hearing are our motions and that their motion isn't set for hearing. And then the judge said, well, I think that's dispositive, so we're going to hear it. I didn't insist on having mine heard. I should have. I should have insisted on having them ruled on so that we'd have a ruling, but they've never been ruled on. We believe that the issues that were inherent in those particular motions, Your Honors, are not irrelevant to this situation because one of them involves the alteration of a document of defendants. I usually would call this a medical expenses table. That's how I would do it. And in it, of course, you list the various providers, the dates of services, and the amount that were charged. On their particular table, they also put across at the top repetitive trauma and then the areas of the body that were the subject of this. The first table, which existed and was created. Your Honor, I wanted to ask you about that because you're saying that the tables altered, but don't those tables reflect two different dates? They do. So they were altered between those dates. The implication of your saying alteration is that they were improperly altered. On the face of it, doesn't it look like they were altered? You may disagree and you may say they're trying to hide something, but they didn't take something that has a specific date and then alter it and keep that date and present it as the actual document, did they? Okay. No. Yes. Okay. That's fair. I didn't mean to imply that they had actually scratched out something, changed it in that way. They are two versions. The original version, which mentioned left knee, no longer exists because it, as a Word document, has been changed. And it was changed at the latter date and left knee was omitted from it. Right. When we got the first document in an early production, even before things were moving along in the case, and it's important to remember that the defendants gave their file to the subsequent attorneys, and so the subsequent attorneys had that as part of the file. We got the second document in their formal answers to discovery responses. And I'm just flying through them, and I recognize that document, so I don't even look, and then I look back at it and I say, Oh, left knee has been dropped out of this one. Then I notice the date has changed. The document was changed after they had been fired, and that's why we think that it's significant that, you know, before they're fired, they have left knee, which they say they were never hired to prosecute. After they're fired, the left knee is gone. But the doctor who only treated the left knee is still there. We believe a worse thing that has occurred in the case was when one of the members of the defendant firm took out one of the old releases that Jess had signed within a week of hiring them, signed them in blank, signed them and didn't date them, and he took one of those out of the file. This is at a time that we're deep into this case, and they are being sued. Had it notarized, send it to the Railroad Retirement Board to get records all ex parte. Thank you, Your Honor. Thank you, Counsel. Counsel? Excuse me. Your Honor, my name is Jim Curran, and I'm here representing Greg Tobin and his law firm. The issue upon which this Court must decide the case is whether, as of January 25th, 2007, 2005, when Greg Tobin and his firm were hired, Mr. Berry still had cause of action for his left knee under the FBLA. The answer is no. Then what did he hire him for? He hired him for all of his FBLA claims. He settled the remaining claims for some $40,000. Now, I'll be frank and tell you that we know a lot more of the background facts right now than Greg Tobin knew on January 27th, 2005. He didn't know, for example, on that date that Dr. Scott had told the plaintiff in 2000 about his knee problems and about the fact that he was going to need surgery and that they were caused by the accident. We know that now, and that changes everything. Now what? Did you clarify with your client, or did they clarify with their client, this 2000 claim is abandoned because it's not filed within the statute of limitations, but you have other claims. Is there anything that supports? That was never discussed with them, I'll be frank with you. So how would Joe Sixpack know what he was hiring the law firm for, what claims? I think he thought that he was hiring for all of his available FBLA claims. Including the 2000 claim? If there had been one, if the statute had not run to end that claim, then he would have. Did anybody tell him, look, you've got this one claim that the statute's run? Not that I'm aware of. Okay. I'm not aware that this conversation came up. Now, the plaintiff's argument has fudged the facts and misstated the law and brought up a number of irrelevant things. I want to talk about all those in their turn. First, the facts. The key facts are that for 30 years, Mr. Berry worked on the railroad, walked on the uneven ballast, and by November 20, 2000, the problem was so severe that he went to see Dr. Scott. Dr. Scott did tell him that the problem was related to his job. It wasn't a fuzzy thing. It wasn't a mic thing. I'm reading from the deposition of Mr. Berry. Question. Did Dr. Scott tell you whether he thought your knee injuries were caused by the football injuries or was it by your work on the railroad? Answer. He said it was from the work on the railroad, uneven footing. This is pages 21 and 22 of the deposition. Question. Okay, so it was November 20, 2000. Dr. Scott told you that it was your railroad work that was causing your knee problems, correct? Answer. Yes, sir. Question. So at that time, November 20, 2000, after Dr. Scott told you that, you knew your left knee problem was work-related, correct? Yes, sir. The law makes it clear that the statute of limitations, three years under the FBLA, starts to run on a case of accumulated trauma like we have here. When the plaintiff knows of his injury and he knows that it may be work-related, he doesn't have to have a doctor come down and tell him it is work-related. He's put on notice if he thinks it might be work-related. We're way past that point. There's absolutely no question that he knew both of the injury, that it was a serious injury that was ultimately going to cause him to have his knee replaced, and that it was related to the work on the railroad. That's really the end of it. The question points out he never learned anything different from that at any time in the past, subsequently. Now, another point that Mr. Owen suggested was that, well, he may have hurt his knee working on the railroad and walking on an uneven balance, but it wasn't the railroad that did anything wrong. I'd like to ask the court to look at the complaint that was filed by the Blunt Associates when they filed this lawsuit. They filed the FBLA claim for the left knee, and they said, years and years of working on uneven surfaces, negligence by the railroad. That's a cause of action that's kind of in the dirt, and I'm sure this court has seen many such claims made. There are a whole host of cases that recognize that that's a cause of action. If Mr. Berry didn't think it was a cause of action, that's irrelevant as well. The Poston case specifically says you don't have to know you've got an FBLA claim. The only thing that starts the statute running that gives you three years to get your stuff together is that it's an injury that's related to work. There's no argument that he knew that then. Now, January 1, 2002, he got a new job. The railroad he worked for consolidated with another one. Some jobs were eliminated. He got a new job at that point, and it caused him to have to walk on uneven balance, as he had all along, more than he had before. There's no argument about that. That was not a new injury. It was not a new anything. It was simply the fact that he had to walk more often than he did before. And I must again take issue with the facts as suggested to you by Mr. Owen. He didn't start having problems in the summer of 2002. There's nothing in the record to support that claim. In fact, his testimony in his deposition was he knew from day one, January 1, 2002, that this was a job that caused more stress on his knee, and he didn't want to do it. So the idea that something happened in the middle of 2002 is based, as far as I'm concerned, solely on the idea on the fact that if he gets sick in the summer of 2002, his case doesn't come out the door. There's no facts and there's no laws to support the suggestion that there was a new injury. In fact, in September of 2002, when he went back to see Dr. Scott, Dr. Scott's diagnosis written in his chart was identical to the diagnosis that he had in November 2000. Osteoarthritis left knee is going to require replacement at some point in the future. There's no new injury here. There's simply an aggravation of an old injury. And as I'm sure you know, the FVLA doesn't have the continuing tort theory. That doesn't exist under the FVLA. Once you have the basic knowledge, you've got three years to bring a claim, and if you don't, you lose it. And that doesn't matter if the knee continues to get worse. It doesn't matter if you continue to aggravate. There is no continuing tort theory in the FVLA. The plaintiff intends that he was informed by his orthopedic specialist on September 13, 2002, that he would still be getting along okay if there had not been a change in his work requirements, and that's Dr. Scott's office notes. Isn't that? I agree with that. But you have to understand, among other things, that this is an aggravation case. He was told he doesn't need knee surgery in November 2000. He's going to need knee surgery later. It's going to be a degenerative condition. I agree that Dr. Scott said that. That doesn't change the running of the statute of limitations, because when things get worse, it doesn't extend the statute. Now, he cited the Greene case in his reply brief. Mr. Owens cited the Greene case as somehow suggesting that the Seventh Circuit rules don't apply to this case. Greene is very interesting, and it's completely different from our case, and I'd like to cite the language quoted by Mr. Owens from the Greene case in his reply brief. He talks about Greene suffering an incident, unlike continually just having the same aggravation of walking on a knee, as we have here. She suffered a specific injury and went to the doctor. As the court in Greene noted, she immediately sought treatment and received a diagnosis different from any prior diagnosis of shoulder pain. That's not what happened here. When Mr. Berry finally went to the doctor, he got a diagnosis identical to his prior diagnosis, not completely different. The suggestion that the injury that was suffered over the years by Mr. Berry is somehow de minimis, because he didn't lose work, is likewise simply not supported by the record. If someone is told you've got arthritis, you're going to have to have your knee replaced. That's not de minimis injury. I also want to get into the discovery issue. First of all, Mr. Owens is talking to you as if the things he put in his motion were, A, undisputed facts, and, B, ruled on by the court somehow improperly. They have nothing whatever to do with whether the statute ran. That's the first thing that's obvious. The second thing is he never raised those issues. He never raised the issues. They were weighed. We filed responses to each of the motions for discovery, and he was content to go forward with the motion for summary judgment without having those issues determined. It's too late now. He can't come in and say, well, let's go back and have the judgment.  Yes, sir. How do we review that? Use discretion? Well, that's the other issue. The trial court has the discretion to craft a remedy that it wants to craft, and it never did. So I don't know how you would – I don't even know how to answer that here. One thing I can answer is that not – No, let me clarify what I'm trying to ask. Let's assume that he properly raised the issues that he posed in his motions of discovery abuse. The court is faced with a motion for summary judgment, motions on discovery abuse. Do we review the court's determination as to which motions to handle first and resolve first on the abuse of discretion standard? I would say yes, Your Honor, unless there's a stronger motion, because he would, first of all, have to establish that the abuse of discovery, which he claims we're guilty of, somehow impacted the motion for summary judgment. Judge Patosian said, I'm going to take this first because this will dispose of everything, and there was silence on the retort. There was no, no, wait a minute, I have to have these rulings, I have to get the court to address these issues because it's important to my motion for summary judgment. And I think it's also important to note that the hearing was not set for the motion for summary judgment. This hearing was set on all pending motions. Mr. – if Mr. Owen, I can assure the court, if Mr. Owen had said, I need more time, I would not have objected, but he never did that. He didn't come in and say, I need to conduct more discovery. He didn't say, I need anything else. He filed his response and he came down and argued the motion. If he'd asked for a continuance because time was short and the judge denied it, that would be an abuse of discretion issue, but he never even asked for that. He was content to file it, he was content to argue this motion, he's content not to have the discovery issues addressed until he lost. Then all of a sudden they become important. That's not a basis for anything. And even though I say it's not a basis for anything, I want to address this list that he's talking about. No one ever suggested – his pleading is that there's list number one, list number two, two different dates. He can say it's a – whatever he calls it. I say it's an update. The fact of how that got created, nobody knows. It's not in this record anywhere. It would be utter speculation for this court to say they went back and changed it. First of all, it's an internal document. It wouldn't change anything on the case. Second of all, the document that he says is the bad document was the one that was handed to the other lawyers. But, again, you know, I realize that we didn't address that. We didn't address it because he didn't ask that it be addressed. It would be wrong for the court to make that some sort of basis for determining the summary judgment motion. It had nothing to do with the summary judgment motion.  Statutory limitations is not an affirmative defense in an FBLA case. It's a requirement. The plaintiff is required to plead and prove that he filed within three years. So there was no reason to raise that anyway. We weren't answering the FBLA claim in the first place. We were answering his claim. And we denied that there was a claim, and that was all that needed to be done. So, Your Honor, based on that, there's simply been nothing in this case to suggest anything other than that the statute began to run on November 20th, 2000. It expired on November 20th, 2003, so 14 months before Greg and his law firm were hired. And for that reason, it must be deferred. Counsel? Very briefly, Your Honors. With regard to the underlying FBLA claim, which was filed by the subsequent lawyers, it was alleged that they had pleaded that he had this repetitive trauma for years and years. Actually, they pleaded no such thing. Paragraph 4, that while working as a track man in the city and county of St. Louis, Missouri, plaintiff was required to regularly perform the duties of his job as prescribed by defendant for the durations prescribed by defendant with the tools, equipment, and machines provided by the defendant, when, as a result of such work, plaintiff experienced long-term cumulative trauma resulting in injuries to his knees and back due to the negligence of this railroad defendant. There's no mention as to the amount of time. The cumulative injuries here, with regard to the left knee, were those which occurred between the time that his job changed to require 10,000 feet of walking to the time that he was completely disabled. How do you respond to the defendant's statement that when the injury gets worse because of a job change, it doesn't extend the statute of limitations? Well, I would disagree with that, Your Honor. All of the cases that I could find under freeze were cases in which there were no job changes. They were cases in which the negligent condition was always the same, and the injury increased over time. And the question was, when is the person supposed to know they're injured, and it relates to the work. There was no change there. That is not this case. This is a case where the initial situation, which was merely an aggravated factor of many life factors, if you look at Dr. Scott's 1120-2000 note, you'll see all of the things that he points to that led to this problem with his knees. And he says he also worked on the railroad for over 30 years, but he doesn't even say in his note that that was a causative factor. This was a situation which was easily controlled with Vioxx, with medication. He never missed a day's work. He became totally disabled when he had an entirely new job, which was negligent and was the grounds for an epilate claim. This earlier was not. It is inconceivable to me that I can have my statute of limitations cut off by a case that I could not bring because there was no negligence. And that's exactly what is happening here. The case where there was negligence, they were hired in time to bring it. They didn't bring it. Thank you, counsel. Thank you. We appreciate briefs and arguments of counsel. We'll take the case under re-advisement. The court will be reassured.